# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

BEVERLY STAYART,                          )
a/k/a BEV STAYART,                        )
an individual,                            )
                                          )
               Plaintiff,    )
                                          )   Case No. 10-C-0043-LA
    v.                                  )
                                          )   Hon. Lynn S. Adelman
YAHOO! INC.,                              )
a Delaware corporation,                   )
                                          )
              Defendant.    )

## PLAINTIFF BEVERLY STAYART'S RESPONSE TO
## DEFENDANT YAHOO! INC.'S MOTION TO
## DISMISS COUNTS I AND II OF PLAINTIFF'S COMPLAINT

COMES NOW, BEVERLY STAYART, a/k/a BEV STAYART, Plaintiff ("Stayart"), and

files this, her Response to Defendant YAHOO! INC.'s ("Yahoo") Motion to Dismiss Counts I and

II of Plaintiff's Complaint, and states:

## INTRODUCTION

This case involves the misappropriation by Yahoo of Stayart's name in the keyword phrase

"bev stayart levitra" which Yahoo sells to advertisers under its "Sponsored Results" advertising

program.  Yahoo simply refuses to seek Stayart's consent and to pay her for this appropriation of

her name.  To paraphrase the district court in a Bette Midler "sound alike" case, Yahoo is no better

than the "average thief."  *Midler v. Ford Motor Co.*, 849 F. 2d 460, 462 (9th Cir. 1988), *cert. denied*,

112 S. Ct. 1513, 1514 (1992).

When an Internet user types the search term "bev stayart" on Yahoo, Yahoo immediately

suggests "bev stayart levitra" in its "search assist box."  When the user presses "enter" after the

search term "bev stayart", Yahoo displays the suggested search "**Also try:  bev stayart** levitra" on

both its header and footer on the page "bev stayart" on Yahoo's web site.  Yahoo has thus crossed

the line from being only an Internet hosting site to an information content provider. Yahoo gives its blessing to the keyword phrase "bev stayart levitra". Yahoo then places paid advertising on the page "bev stayart levitra" on its web site. Yahoo thereby misappropriates Stayart's name for commercial purposes, in violation of the Wisconsin privacy/publicity law, Wisconsin Statutes § 950.50(2)(b). Plaintiff's unique and distinctive personal name is **not** in the public domain, for sale to the highest bidder, to provide Yahoo with a revenue stream.

Wisconsin has enacted a privacy law to protect individuals from the misappropriation of their name. The Wisconsin legislature has declared that the "use, for advertising purposes, or purposes of trade, of the name . . . of any living person", without consent, is an invasion of privacy.

As the Internet has become more commercialized and advertising more popular, online advertisers have sought to target consumers by specific "keywords" or "keyword phrases" that advertisers purchase from search engines, such as Yahoo. When an Internet user types in certain words associated with a particular advertiser's keywords, he is given links to that advertiser's web site.

Keyword advertising renders the purchaser's web site more prominent than competing sites. This is by prioritizing the purchaser's web site in the search results (*e.g.*, through a so-called "sponsored" link).

Yahoo, in its Motion to Dismiss, at 1-2, alleges:

> This is Plaintiff's second attempt to seek redress in this Court for her displeasure with the results she encountered when she ran Internet search queries of her own name in defendant Yahoo's search engine. As her complaints make clear, the real source of Plaintiff's ire are the third-party web sites appearing in Yahoo's search results that make what Plaintiff considers a distasteful or embarrassing association of her name with erectile dysfunction medications. Rather than taking action directly against the third parties that created these web sites for the reputational harm she claims to have suffered from their existence, Plaintiff has instead targeted Yahoo!.

The allegations of the Complaint are specifically targeted at (1) Yahoo's suggestion of "bev stayart levitra" in its search assist box when an Internet user types the search term "bev stayart" on Yahoo's search engine; (2) Yahoo's suggestion of the search "**Also try: bev stayart** levitra" in a header and a footer on the page "bev stayart" on Yahoo's web site when the Internet user clicks "enter" after the search term "bev stayart", and; (3) Yahoo's ensuing "Sponsored Results" ads which appear on the page "bev stayart levitra" on Yahoo's web site when an Internet user clicks on the header or footer "**Also try: bev stayart** levitra".

There should **not** be the page "bev stayart levitra" on Yahoo's web site. Without the page "bev stayart levitra" there would be no place for Yahoo to sell and place "Sponsored Results" ads.

Stayart is **not** suing Yahoo for the "natural," or organic, web sites that also appear on the page "bev stayart levitra" on Yahoo's web site, as Yahoo falsely claims (Motion to Dismiss, 1-2). Stayart is suing Yahoo for using her name for purposes of advertising and trade by selling, for profit, the keyword phrase "bev stayart levitra" to Yahoo's advertising customers. Yahoo's "Sponsored Results," purchased by these advertisers, appear on the same page with the natural results. The billboard "bev stayart levitra", created by Yahoo, is where Yahoo places these "Sponsored Results" advertisements (Complaint, Exhibit 7).

Wisconsin law clearly protects Stayart's interests in this litigation, notwithstanding Yahoo's disingenuous rhetoric. The Wisconsin Supreme Court in *Hirsch v. S. C. Johnson & Son*, 90 Wis. 2d 379, 391, 280 N.W. 2d (1979) defined the interest to be protected as follows:

> Because the right of publicity – the right to control the commercial exploitation of aspects of a person's identity – differs from other privacy rights, it is appropriate for this court to recognize a cause of action to protect this right, although other privacy rights were rejected in prior decisions of this court. **Protection of the privacy value of one's name is supported by public policy considerations, such as the interest in controlling the effect on one's reputation of commercial users of one's personality and the prevention of unjust enrichment of those who appropriate the publicity value of one's identity** (emphasis added).

3

This is **not** a defamation case. Stayart has a legitimate right under Wisconsin law to protect her name from commercial misappropriation by Yahoo.

## ARGUMENT

### 1. Standards for a Motion to Dismiss

Yahoo has filed a motion to dismiss Stayart's complaint, pursuant to Rule 12(b)(6), Fed. R. Civ. P. Rule 8 states that, "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing the pleader is entitled to relief." Rule 8(a)(2), Fed. R. Civ. P.

This means simply that the "[f]actual allegations must be enough to raise the right to relief above the speculative level." *Bell Atlantic Corp. v. Trombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted). "[H]eightened fact pleading of specifics" is not required to survive a motion to dismiss. *Bell*, 127 S. Ct. at 1973-74. A complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (*per curiam*).

A complaint "should not be dismissed if it is possible to hypothesize facts, consistent with the complaint, that would make out a claim." *Petri v. Gatlin*, 997 F. Supp. 956, 965 (N. D. Ill. 1997) (citation omitted). The court must accept as true all well-pled allegations in the complaint and draw all reasonable inferences in favor of Stayart. *Faur v. Sirius Int'l Ins. Corp.*, 391 F. Supp. 2d 650, 654 (N. D. Ill. 2005). Stayart must only allege "enough facts to state a claim that is "*plausible on its face*." *Bell*, 127 S. Ct. 1955, 1974 (2007) (emphasis added).

Because Stayart has adequately stated each of her claims, this Court should deny Yahoo's motion to dismiss and order that it answer her complaint.

### 2. Facts Assumed To Be True

4

Stayart is an adult resident of Elkhorn, Wisconsin (Complaint, ¶ 2). She is an *atypical* Internet user in that she is not someone who just anonymously surfs the Internet.

She is frequently involved in public advocacy on behalf of animal protection programs throughout the United States and the world (Complaint, ¶ 10). She has actively participated in recent campaigns to save the wild horse population in the western United States; to save the baby seal population in eastern Canada; to prohibit the aerial shooting of wolves in the United States; to shut down puppy mills; and to prohibit abusive practices in factory farms and slaughterhouses (Complaint, ¶ 11).

Stayart is also involved in genealogy research throughout the world (Complaint, ¶ 12).

She regularly uses the Internet to further her role as an animal rights activist and genealogist (Complaint, ¶ 13). She uses both her names Beverly Stayart and Bev Stayart on the Internet in all of her endeavors (Complaint, ¶ 17).

She has an Internet presence. She is a contributor to an online discussion forum for genealogical and historical research concerning the Siouan people (Saponi) at www.saponitown.com. This third-party web site contains her photo, address, and other personal information (Complaint, ¶ 14). Stayart's periodic, scholarly posts on this third-party web site have generated approximately 20,000 hits (online visitors) during the past four years (Complaint, ¶ 15).

Two copyrighted poems written by Stayart appear on three Danish web sites supporting the preservation of the baby seal population in eastern Canada (Complaint, ¶ 16). These poems may be viewed at www.bentbay.dk/seal_kils.htm, www.animallover.dk/seal/seal-hunt2.htm and www.bentbay.dk/REDAK.HTM.

She has a *unique* and *distinctive* personal name. She is the only "Beverly Stayart" and "Bev Stayart" on the Internet. She uses both her names in her endeavors (Complaint, ¶ 17). Her name has commercial value for advertising purposes or for purposes of trade because of her public

5

advocacy on behalf of animals, her positive and wholesome image, and the popularity of her

scholarly posts on the Internet (Complaint, ¶ 18).

Stayart's name is a keyword phrase on the Internet.[1]  According to the Internet analytics

firm, Compete.com, between January 15 and April 15, 2009, at least five destination web sites have

received traffic from Internet searchers using the search term "Beverly Stayart" (Complaint, ¶ 20).

This is also true for the period between February 11 and May 12, 2009 (Complaint, ¶ 21).

The Internet has been called the public's "information superhighway." *American Libraries

Assoc. v. Pataki*, 969 F. Supp.160, 161 (S.D.N.Y. 1997).  "Search engines" are the vehicles that

enable the public to access the Internet's "information superhighway."

Yahoo provides a search engine, or directory, at its main interactive web site,

www.yahoo.com (Complaint, ¶ 25).  This web site is available on the Internet to the general public

worldwide, without limitation, and is owned by Yahoo (Complaint, ¶ 26).

All search engines have three basic parts:  (1) a crawler program;  (2) an index of sites that

have been "crawled", and;  (3) a "user interface" that employs a search algorithm to produce results

to search queries.[2]  "Crawlers" are programs that "traverse the Web," and add new web sites to an

index.[3]  The index, which is similar to an index found at the end of a book, lists the found sites.[4]

The role of the algorithm is to rank the relevance of the web pages to the search terms selected by

the users of the search engine.

Yahoo's search engine checks the search terms entered into its directory against its

databases, and applies its algorithm to produce search result page(s) that may relate to the user's

---

[1] Keywords are terms or phrases that are entered into a search engine by a person wanting to find an Internet website
pertaining to the particular words entered.  Paul W. Garrity, *Search Engine Advertising 101*, METROPOLITAN CORP.
COUNS., Mar. 2007, at 18, *available at* www.docstoc.com/docs/32840417/18
[2] Kristine Laudadio Devine, *Preserving Competiton in Multi-Sided Innovative Markets:  How Do You Solve a Problem
Like Google?*, 10 NORTH CAROLINA JOURNAL OF LAW & TECHNOLOGY 59, 67 (Fall, 2008).
[3] *Ibid.*
[4] *Ibid.*

terms.  It also provides "links," or embedded electronic addresses, to those web sites (Complaint, ¶ 29).

Most of Yahoo's online content and services are provided for free.  It profits from these free services primarily by the sale of advertising that appears in conjunction with its free services (Complaint, ¶ 28).

One of the largest components of Internet advertising is search engine keyword advertising. It is an enormous source of revenue for commercial search engines.  *See, e.g., Today in Business, Trial on Google Ad System*, NY TIMES, May 12, 2007, at C2 (The AdWords system made up 98% of Google's $10.6 billion in revenue in 2007).

Search engines typically display at least two groups of search results on the results page.[5] One group is comprised of organic links (or non-sponsored links) that the search engine creates using its proprietary algorithm.[6]  The other group is comprised of sponsored links (or non-organic links) to web sites appearing as a result of the search engine placing them on the results when certain keywords are searched.[7]

As set forth in *Government Employees Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 701-02 (E. D. Va. 2004), describing the alleged behavior of Google and Overture Services, Inc.[8], two Internet search engines:

> Google and Overture operate Internet search engines, which are used by consumers to search the World Wide Web for, among other things, Websites offering products and services.  The search engines work by comparing search terms entered by the Internet user with databases of Websites maintained by the search engine, generating a results page that lists the Websites matching the search term. . . . Both Google and Overture also sell advertising linking to search terms, so that when a consumer enters a

---

[5] Bernard Jansen, *An Examination of Searcher's Perceptions of Nonsponsored and Sponsored Links During Ecommerce Web Searching*, JOURNAL OF THE AMERICAN SOCIETY FOR INFORMATION SCIENCE AND TECHNOLOGY 57(14):  1949-1961 (2006).

[6] *Ibid.*

[7] *Ibid.*

[8] Overture Services, Inc. once was a Yahoo marketing affiliate.

particular search term, the results page displays not only a
list of Websites generated by the search engine program using
neutral and objective criteria, but also links to Websites of
advertisers (listed as ""Sponsored Links").

Yahoo claims to provide Internet searchers with the "best" experience on the World Wide Web by directing users to only "high quality" and "relevant" web content in response to queries (Complaint, ¶ 34). It describes as "unwanted" content "misuse or inaccurate use of competitor or brand names" (*Ibid.*).

Yahoo's advertising program is called "Sponsored Search®." It is described by Yahoo as follows (available at http://searchmarketing.yahoo.com/legal/trademarks.php):

> For bids on search terms in Yahoo! Search Marketing's Sponsored
> Search service, Yahoo! Search Marketing (formerly Overture
> Services, Inc.) requires advertisers to agree that their search terms,
> their listing titles and descriptions, and the content of their Web sites
> do not violate the trademark rights of others. In cases in which an
> advertiser has bid on a term that may be the trademark of another,
> Yahoo! Search Marketing allows the bids only if the advertiser
> presents content on its Web site that (a) refers to the trademark or
> its owner in a permissible nominative manner without creating a
> likelihood of consumer confusion (for example, sale of a product
> bearing the trademark, or commentary, criticism or other permissible
> information about the trademark owner or its product) or (b) uses
> the term in a generic or merely descriptive manner. In addition, the
> advertiser's listings should disclose the nature of the relevant content.

*See*, Exhibit A, attached hereto. The Court is asked to take judicial notice of Yahoo's web page pursuant to Fed. R. Evid. 201(b)(2). *See generally, Shrover v. New Cingular Wireless Servs., Inc.*, 498 F. 3d 976 (9th Cir. 2007).

Yahoo's advertising program is a "PPC" program.[9] An advertising participant first pays to have his web site displayed in the "Sponsored Results" sections of search results whenever an Internet user searches for a particular keyword or keyword phrase. The advertiser pays again *each time* an Internet user "clicks" on a "Sponsored Results" advertisement ("Pay Per Click" or "PPC").

---

[9] Jerri L. Ledford, *SEO Search Engine Optimization BIBLE* 158 (Wiley Publishing, Inc., 2008).

There is a key difference between print and television advertisements and Yahoo's "Sponsored Results" advertising. A television watcher, for example, sees an ad without first providing the advertiser with any personal information about his interests. But a "Sponsored Result" ad on Yahoo does not appear until a person has expressed an interest in a keyword or keyword phrase. This process may be deceptive because it suggests some relationship or affiliation between the keyword or keyword phrase and the "linked" web site which may not, in fact, exist.

Yahoo's practice of calling paid advertising on its search engine "Sponsored Results" does not cure this problem because Yahoo fails to inform Internet users who is doing the "sponsoring."[10]

Plaintiff has never given Yahoo any permission, authority or license to use or sell the right to use the name "Beverly Stayart" or "Bev Stayart" for the promotion or sale of any goods or services on the Internet, or in any other media, either directly or indirectly (Complaint, ¶ 24).

On December 17, 2009, Stayart visited Yahoo's search engine at www.yahoo.com from a computer in Walworth County, Wisconsin (Complaint, ¶ 36). She used the search term "Bev Stayart" to find information about herself on Yahoo's search engine (*Ibid.*).

When she typed in "Bev Stayart", Yahoo's "search assist" box immediately displayed the phrase "bev stayart levitra" even before she could press the "enter" key for "Bev Stayart" (Complaint, ¶ 37).

Levitra® is the registered trademark of a nationally advertised oral treatment for sexual dysfunction, marketed and distributed by Schering Plough Corporation of Kenilworth, New Jersey (Complaint, ¶ 38).

After Stayart pressed the "enter" key, a "header" was displayed on Yahoo's web site before the first natural result, which stated: "**Also try: bev stayart levitra**" (Complaint, ¶ 39; Exhibit 5 to

---

[10] According to one study, five out of six search engine users cannot tell the difference between sponsored links and natural results, and roughly half are unaware that a difference exists. *See*, Deborah Fallows, *Search Engine Users*, PEW INTERNET & AM. LIFE PROJECT, Jan. 23, 2005, at 17-18, *available at* http://www.wired.com/culture/lifestyle/news/2005/01/66374

Complaint). In addition, a "footer" was displayed on Yahoo's web site at the bottom of the page, which similarly stated: "**Also try:  bev stayart** levitra" (Complaint, ¶ 40;  Exhibit 5 to Complaint).

On this date, Stayart found a total of 1,630 search results for "Bev Stayart" on Yahoo's search engine.  On *each* and *every* page of these search results, there appeared the same "header" and "footer", associating Stayart with levitra (Complaint, ¶ 41).

On information and belief, Yahoo created the keyword phrase "bev stayart levitra" which automatically appears in Yahoo's "search assist" boxes in connection with its displayed search results for her (Complaint, ¶ 44).  Yahoo, on information and belief, also created the described "headers" and "footers" appearing in connection with its displayed search results for her (Complaint, ¶ 43).

On December 17, 2009, Stayart found 399 search results for "bev stayart levitra" on the page "bev stayart levitra" on Yahoo's web site, after clicking on the "header" "**Also try:  bev stayart** levitra" on the page "bev stayart" on Yahoo's web site (Complaint, ¶ 46; Exhibit 7 to Complaint).  Two "Sponsored Results" advertisements selling levitra appear on the first page of these search results, at the top and the bottom (Exhibit 7 to Complaint).[11]  The domain owner of both of these "Sponsored Results" ads is www.Levitra.kwikmed.com.  The title is "Purchase 20 Mg Levitra Online."  The ad states:  "Online Levitra Pharmacy!  Licensed Doctors & Online Prescriptions."  Immediately beneath this "Sponsored Results" ad, Yahoo suggests "See your message here . . ." soliciting additional for profit ads. Almost all of the "natural" or organic search results on the page are web sites marketing "cialis", "viagra", and/or "levitra" (*Ibid.*).

Cialis® is the registered trademark of a nationally advertised oral treatment for sexual dysfunction, marketed and distributed by Eli Lilly and Company, Indianapolis, Indiana (Complaint,

---

[11] There were also additional "Sponsored Results", linking Stayart through the keyword phrase "bev stayart levitra" to other web sites promoting sexual dysfunction drugs on the subsequent search results pages, which are not attached to the Complaint.

¶ 48). Viagra® is the registered trademark of a nationally advertised oral treatment for sexual dysfunction, marketed and distributed by Pfizer, Inc., New York, N.Y. (Complaint, ¶ 49).

Yahoo has gained substantial pecuniary benefit from the unauthorized use of Plaintiff's name in connection with the advertising and promotion of levitra, on information and belief, in the manner described above (Complaint, ¶ 51).

On December 18, 2009, Stayart's counsel sent a demand letter, by facsimile and priority mail, to *two* of Yahoo's counsel. Plaintiff demanded, through her counsel, that Yahoo cease and desist its unauthorized use of her name to advertise and promote levitra (Complaint, ¶¶ 61, 67; Exhibit 15 to Complaint).

Almost one month later, on January 14, 2010, Stayart again visited Yahoo's search engine and entered the search term "Bev Stayart." Despite her prior letter of December 18, 2009, she found 1,400 search results with the same headers and footers associating her with "levitra" on every page (Complaint, ¶ 42; Exhibit 6 to Complaint).

By its described conduct, Yahoo has used, and continues to use, Plaintiff's name for advertising purposes and purposes of trade, without her consent. This violates Wisconsin Statutes § 995.50(2)(b) (Complaint, ¶¶ 35 – 64, FIRST CAUSE OF ACTION) and the common law of Wisconsin (Complaint, ¶¶ 65 – 70, SECOND CAUSE OF ACTION).

## 3.      The Scope and Interpretation of Wisconsin Law

The Wisconsin privacy statute, enacted in 1977, protects three distinct actionable invasions of privacy, including "use", without authorization, of a living person's name or likeness for advertising or trade purposes. Wisconsin Statutes § 995.50(2)(b). Commercial misappropriation of a person's name is also prohibited by the common law of Wisconsin. *Hirsch v. S. C. Johnson & Son, Inc.*, 90 Wis. 2d 379, 280 N.W. 2d 129 (1979).

The RESTATEMENT (SECOND) OF TORTS § 652(C) (1977) defines the interest to be protected as follows:

> One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of privacy.

The rationale for the misappropriation doctrine is stated in the RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 38, *cmt. b* (1995):

> [P]rotection against the misappropriation of intangible trade values insures an incentive to invest in the creation of intangible assets and prevents the potential unjust enrichment that may result from the appropriation of investment made by another.

Stayart's complaint is captioned as involving the "right of privacy." But the allegations reflect claims involving the "right of publicity" defined in subsection (2)(b) of the statute. *See, Heinz v. Frank Lloyd Wright Foundation*, 1986 WL 5996 at * 7, 229 U.S.P.Q. 201, 206 (W. D. Wis. 1986).

*Cf.*, Judith Endejan, *The Tort of Misappropriation of Name or Likeness Under Wisconsin's New Privacy Law*, 1978 WIS. LAW REVIEW 1029, 1030 (explaining that subsection (2)(b) is really a derivative of the common law appropriation tort). As drafted, subsection (2)(b) of the statute protects the dual interests of right of privacy and right of publicity. *Ibid.*, at 1032.

Wisconsin Statutes § 995.50(2)(b) should be broadly construed, given this strong public policy. *Cf.* Endejan, *infra*, at 1057:

> Thus the teachings of other jurisdictions should be instructive to the Wisconsin Courts. Generally these approaches reveal that the use of a name or pictures for commercial gain should be actionable in nearly every case . . . . Both privacy and publicity interests should be furthered by the tort. These dual interests can be protected by granting relief even if there is no adverse economic effect on the plaintiff.

*And see*, Wisconsin Statutes § 995.50(3):

The right of privacy recognized in this Section shall be interpreted in accordance with the developing common law of privacy . . . .

## 4. The Alleged Conduct of Yahoo Is A "Use" Within the Meaning of § 995.50

### a. The Plain Meaning of the Statute

Yahoo's repeated sale of the name "bev stayart" as part of the keyword phrase "bev stayart levitra" to trigger keyword advertising is a "use" of Stayart's name as that word appears in the statute. Yahoo has clearly used Stayart's name to sell its "Sponsored Results" advertising on its search engine.

The proper way to read a statute was explained by the Wisconsin Supreme Court in *State ex rel. Kalal v. Circuit Court*, 271 Wis. 2d 633, 681 N. W. 2d 110 (2004). One begins with the statutory language because this expresses the legislature's intent. *Kalal*, 271 Wis. 2d at 662.

The language must be given its "common, ordinary, and accepted meaning," except for technical or specially defined words. *Ibid.* When the language is unambiguous, extrinsic aids should not be consulted, for "[i]t is the enacted law, not the unenacted intent, that is binding on the public." *Ibid.*

In this case, the language of § 995.50(2)(b) is plain, clear and unambiguous. Wisconsin law prohibits "[t]he use, for advertising purposes or purposes of trade, of the name . . . of any living person" without first having obtained the consent of that person. Nothing in any of these words suggests any ambiguity so that the legislative history or intent should be looked at to interpret the meaning of § 995.50(2)(b), and especially the word "use."

The common, ordinary and accepted meaning of "use" includes obtaining money to have "Sponsored Results" advertisements triggered any time an Internet searcher clicks on the header or footer "**Also try:  bev stayart** levitra" displayed on the page "bev stayart" on Yahoo's web site.

13

Any other interpretation would not advance the purposes of the statute. A court presumes that "the legislature intends for a statute to be interpreted in a manner that advances the purposes of the statute." *Verdoljak v. Mosinee Paper Co.*, 200 Wis. 2d 624, 635, 547 N.W. 2d 602 (1996).

This "plain language" interpretation is confirmed by reference to the dictionary definitions. *Cf. Kalal*, at 668 (the term at issue had a "common and accepted meaning, ascertainable by reference to the dictionary definition").

BLACK'S LAW DICTIONARY defines "use" as "[t]he application or employment of something." (BLACK'S LAW DICTIONARY 1681 (9th ed. 2009)). Further, English language dictionaries define "use" as "application or conversion to some purpose" and "continued or repeated exercise or employment." 2 THE NEW SHORTER OXFORD ENGLISH DICTIONARY 3531 (1993); WEBSTER'S THIRD INTERNATIONAL DICTIONARY 2523 (1986).

Here, the name "bev stayart" is "applied" or "employed" or "converted" by Yahoo in the keyword phrase "bev stayart levitra", and the purpose is plainly for purposes of advertising or trade; *i.e.*, to trigger the appearance of "Sponsored Results" advertisements whenever an Internet user clicks on the header or footer "**Also try: bev stayart** levitra" displayed on the page "bev stayart" on Yahoo's web site.

### b. Trademark Cases Involving Keyword Advertising Demonstrate That the Alleged Conduct of Yahoo Is A "Use"

Trademark cases under the Lanham Act are helpful on the issue of whether Yahoo's alleged conduct is a "use" of Stayart's name within the meaning of § 995.50(b)(2).

A finding of trademark infringement under the Lanham Act requires a finding that the alleged infringer "use[d] in commerce" the plaintiff's trademark "on or in connection with any goods or services." 15 U.S.C. § 1125(a). As a result, trademark cases involving the sale of

14

keywords to Internet advertisers are analogous to cases under § 995.50(2)(b) where the keyword sold is someone else's trademark.

Most federal courts have consistently held that sponsored linking involving a trademark constitutes a "use in commerce" for purposes of the Lanham Act. *See, e.g., Government Employees Insurance Company v. Google, Inc.*, 330 F. Supp. 2d 700, 703-04 (E. D. Va. 2004) (in suit alleging trademark infringement by two search engines which, among other things, sold advertising linked to plaintiff's trademarks, concluding that plaintiff had pled sufficient facts for trademark "use" where the "complaint clearly alleges that defendants use plaintiff's trademarks to sell advertising, and then link that advertising to the results of searches"); *Buying for the Home v. Humble Abode, LLC*, 459 F. Supp. 2d 310 (D. N. J. 2006) (concluding that plaintiff satisfied "use" requirement of the Lanham Act "in that Plaintiff's trademark was allegedly employed to trigger commercial advertising which included a link to defendants' furniture retailing website" and as such, "the [plaintiff's] mark was used to provide a computer user with direct access (*i.e.*, a link) to Defendants' website through which the user could make furniture purchases"); *J. G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC*, 2007 U.S. Dist. LEXIS 288 (E. D. Pa., Jan 4, 2007) (finding that a competitor's use of a company's name as a keyword under an advertising program offered by an Internet search engine constituted a "use" under the Lanham Act); *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 527 F. Supp. 2d 205, 207 (D. Mass. 2007) ("Because sponsored linking necessarily entails the 'use' of the plaintiff's mark as part of a mechanism of advertising, it is 'use' for Lanham Act purpose") (*reversed on other grounds*).

Seventh Circuit cases are also in accord with the majority of jurisdictions that hold that the sale of trademark keywords by search engine providers constitutes a commercial "use." *Morningware, Inc. v. Hearthware Home Prods., Inc.*, 673 F. Supp. 2d 630 (N. D. Ill. 2009).

Because the majority of federal courts have held that the practice of selling trademark keywords for Internet advertising is a commercial "use," including cases in the Seventh Circuit, then it logically follows that the sale of a living person's name as part of a keyword phrase is a "use" under Wisconsin Statutes § 995.50(2)(b). A living person deserves at least the same – if not more – protection against the unauthorized use of this person's name, as a trademark holder enjoys against the unauthorized use of its trademark.

### c. Yahoo Itself Considers Such Conduct a "Use"

A simple statement by Yahoo itself on the Internet about its advertising program confirms that the alleged conduct of Yahoo is a "use." In explaining its Search Marketing® program, Yahoo tells the public (Exhibit A, at 1):

> If you have a concern that a search term associated with an advertiser's listing is an improper *use* of a term that is a trademark, Yahoo Search Marketing will review the advertiser's listing for compliance with our relevancy guidelines . . . . (emphasis added).

"Use" is stated in Yahoo's advice according to its ordinary and customary meaning. This is the same ordinary and customary meaning that requires Yahoo's conduct be considered a "use" under § 995.50(2)(b).

## 5. Wisconsin Recognizes Right of Privacy Under Common Law

Yahoo blindly asserts, in *ipse dixit* fashion, that there is no common law right to privacy in Wisconsin (Motion to Dismiss, at 14). Yahoo is clearly wrong.

Traditionally, Wisconsin did not recognize the right to privacy at common law. *Yoeckel v. Samonig*, 272 Wis. 430, 434, 75 N. W. 2d 925 (1956). This was changed in *Hirsch, infra.* This case was decided under Wisconsin's *common law* because the statute (originally enacted as § 895.50) became effective only after the *Hirsch* cause of action arose. *Hirsch*, 90 Wis. 2d at 387.

This Court has recognized the common law right of privacy in Wisconsin. *Joel v. Various John Does*, 499 F. Supp. 791, 792 (E. D. Wis. 1980).

More recently, in *Conrad v. Madison Festivals, Inc.*, 2009 WL 3018031 at * 4 (W. D. Wis. 2009), Chief Judge Barbara B. Crabb in Madison acknowledged:

> Wisconsin recognizes a right of publicity under both statutory and common law (citing cases).

## 6. Proof of a "Property" Right in One's Name Is Not a Required Element

Yahoo, in furtherance of its attempt to cloud the fact that a clear statutory violation has been alleged by Stayart, claims that she failed to assert a "property" right in her name under § 995.50 (Motion to Dismiss, at 14-18). The fact that this "requirement" is nowhere to be found in the text of § 995.50(2)(b) is abundantly clear.

*See, Conrad v. Madison Festivals, Inc., supra, at* * 4:

> Plaintiff's allegation that defendants Madison Festivals and Purple Door Productions "cashed in" on her image as the Banana Lady in its advertising is sufficient to state a claim of right of publicity under Wisconsin law. *Hirsch*, 90 Wis. 2d at 397, 280 N. W. 2d 129 ("**All that is required is that the name clearly identify the wronged person**."); 5 McCarthy at § 28:7 (emphasis added).

Yahoo's argument that Stayart's name has no value is ludicrous. *Cf. McFarland v. Miller*, 14 F. 3d 912, 919, 921 (3rd Cir. 1994) (defendant's misappropriation of plaintiff's identity is sufficient evidence of commercial value). Everyone has a property interest in their name. *Brown Chem. Co. v. Mayer*, 139 U.S. 542, 544 (1891).

## 7. Stayart Has Alleged Sufficient Facts to Warrant an Award of $75,000 or More In Damages

Yahoo next argues that Stayart has not alleged sufficient facts to warrant a recovery of $75,000 in damages for diversity jurisdiction (Motion to Dismiss, at 18-21). Yahoo is obviously wrong.

17

In order to dismiss on jurisdictional grounds "[i]t must appear to a *legal certainty* that the claim is really for less than the jurisdictional amount." *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938) (emphasis added). This test still controls today. *Freeman v. Sports Car Club of America, Inc.*, 51 F. 3d 1358, 1362 (7th Cir. 1995). A plaintiff is in the best position to know how much her claim is worth, and a plaintiff's request for damages is deemed to be made in good faith. *St. Paul Mercury, supra*, at 288.

Under Wisconsin's privacy statute, the successful plaintiff is entitled to compensatory damages (§ 995.50(1)), which are "not limited to pecuniary loss alone" (§ 995.50(4)).

Yahoo again misstates Wisconsin law when it declares that "Under the plain language of Wis. Stat. § 995.50(1)(b), only compensatory damages are recoverable." (Motion to Dismiss, at 18). Yahoo ignores the language of § 995.50(4).

Recovery for mental and emotional distress typically connected with the misappropriation of a name, image or likeness has been consistently deemed recoverable under the right of privacy throughout the United States. *See, Bradley v. Cowles Magazine*, 26 Ill. App. 2d 331, 168 N. E. 2d 64 (1st Dist. 1966); *Olan Mills, Inc. v. Dodd*, 353 S. W. 2d 22 (Ark. S. Ct. 1962) ["I can't go out on the street. I am embarrassed. I have lost weight. I can't sleep."] *McAndrews v. Roy*, 131 So. 2d 256 (La. Ct. App. 1961) [plaintiff called "muscle-head, muscle-brain, muscle-body" and everything but his right name]; *Fairfield v. American Photocopy Equip. Co.*, 158 Cal. App. 53, 322 P. 2d 93 (1958) ["I felt humiliated, embarrassed, chagrined."]; *Joe Dickerson v. Dittmar*, 34 P. 3d 995 (Colo. S. Ct. 2001) [plaintiff who seeks only personal damages for invasion of privacy need *not* prove the value of her identity].

*See also*, RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 49, comment *b* (1995):

> [P]rotection is available under the right of privacy for the personal
> interest in controlling the use and exploitation of one's identity. Private

18

individuals . . . frequently suffer greater emotional than pecuniary harm from an unauthorized commercial appropriation of their identity.

In ¶ 58 of her complaint, Stayart alleges:

> Yahoo's unauthorized use of Stayart's name and reputation to advertise "levitra" invades Stayart's privacy, defrauds the public, injures Stayart's professional prestige, standing, and reputation among Stayart's colleagues and the public by implying that she has a personal pecuniary interest in "levitra", and has caused her embarrassment, humiliation, anxiety, and other emotional distress, resulting in damages in a total to be established by proof at trial, but in excess of the jurisdictional minimum.

By these allegations, which Yahoo ignores, Stayart seeks damages for emotional distress **in excess** of $75,000.

Whether Stayart has suffered emotional distress and the amount of that distress are, of course, fact questions **not** susceptible to resolution by a motion to dismiss. *Meyerkord v. Zipatoni Co.*, 2008 WL 5455718 (Mo. App. E. D.) ("false light" invasion of privacy case involving Internet web site; whether content wrongfully attributed to plaintiff and whether this caused him shame, embarrassment, humiliation, harassment and mental anguish questions for jury; trial court's grant of motion to dismiss reversed).

Compensatory damages under § 995.50(1)(b) include either "plaintiff's loss or defendant's unjust enrichment." In this case, Yahoo has obtained money from its advertisers by undue advantage, and holds that money, which, in equity and good conscience, belongs to Plaintiff. *See*, ¶ 59 of her Complaint.

There were **399 search results** on the page "bev stayart levitra" on Yahoo's web site on December 17, 2009. The page "bev stayart levitra" (page 1, at bottom) on Yahoo's web site shows ten organic or "natural" web sites, excluding two of Yahoo's "Sponsored Results" ads which appear at the top and bottom of the page. *See*, Complaint, Exhibit 7. Assuming approximately ten organic

web sites per page, 399 search results for "bev stayart levitra", divided by ten, equals 40 pages of results for "bev stayart levitra."

With two "Sponsored Results" ads shown on the *very first page* of these results, at both the top and bottom (*Ibid.*), Stayart needs discovery to learn the total number of "Sponsored Results" ads Yahoo has sold to advertisers. There are roughly 39 *additional* pages for "bev stayart levitra" on Yahoo's web site which may contain "Sponsored Results" ads. Yahoo permits a **maximum of 14** "**Sponsored Results" ads per page**, according to its PPC guidelines. Additionally, Stayart needs discovery to learn the *upfront amount* Yahoo charged each of these advertisers to display each of these "Sponsored Results" ads. Stayart needs discovery to learn how many clicks occurred on each "Sponsored Results" ad, and the amount Yahoo charged the advertiser each time a "Sponsored Results" ad was clicked.

This information, related to Stayart's unjust enrichment claim, is presently under the exclusive control of Yahoo and its advertisers. But at the pleading stage, it is not a *legal certainty* that the total amount earned by Yahoo will be less than $75,000. Whatever the amount, it is properly added to the amount Stayart seeks for emotional distress.

Given these allegations, plus the possibility of an award of attorney fees and punitive damages (Complaint, ¶¶ 60-63), the $75,000 "amount in controversy" has been more than established.

For example, in *Beverly v. Choices Women's Medical Ctr., Inc.*, 78 N.Y. 2d 745, 579 N.Y. S. 2d 637, 640, 587 N. E. 2d 275 (1991) (N.Y. law), the plaintiff was a physician.[12] Her picture was knowingly used without her consent in a 1985 promotional calendar by a for-profit medical center that performed abortions. There was testimony that the plaintiff suffered physical and mental injury, and that this episode affected her lifestyle and career decisions. A jury more than *twenty*

---

[12] Wisconsin's "appropriation type" of invasion of privacy statute is modeled upon a similar New York statute. *Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 887 n. 9 (E. D. Wis. 2009).

*years ago* awarded the plaintiff $50,000 in compensatory damages and $25,000 in punitive damages, a total of $75,000.

　　　　*See also, Tongkook America, Inc. v. Shipton Sportswear Co.*, 14 F. 3d 781, 785 (2d Cir. 1982)):

> [Where] a plaintiff is seeking unliquidated damages in a tort action,
> a district court should permit the case to proceed and not predetermine
> whether the plaintiff could recover the minimum statutory amount.

## 8.　　　　Stayart's Claims Are Not Barred By Res Judicata

　　　　Yahoo misstates federal law by arguing, in *ipse dixit* fashion, that Stayart's present claims are barred by res judicata (Motion to Dismiss, at 21).

　　　　In previous litigation, this Court held that Stayart lacked prudential standing to bring a false endorsement claim against Yahoo under § 43(a) of the Lanham Act, 15 U.S.C. § 1125. This was for events occurring between September and December, 2008, on Yahoo's search engine. *Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 878-79, 881-82 (E. D. Wis. 2009).

　　　　This Court then declined to exercise supplemental jurisdiction over four related state law claims for invasion of privacy against Yahoo and its marketing affiliate Overture Services under Wisconsin law. 651 F. Supp. 2d at 886-888. The dismissal of Stayart's state law claims was expressly "without prejudice to repleading in state court" (651 F. Supp. 2d at 888) and "without prejudice to any request for damages in state court" (651 F. Supp. 2d at 889 n. 11).

　　　　The present case involves Yahoo's "sponsored" links advertising program, which was *not* the subject of the previous litigation. Further, the present case involves events on Yahoo's search engine which began in December, 2009, a *year* later, and continue to the present.

　　　　For federal res judicata to apply, there must be (1) a final judgment on the merits of an earlier action; (2) an identity of the cause of action in both the earlier and later suit; and (3) an

identity of parties or privies in the two suits. *Brown v. J. I. Case Co.*, 813 F. 2d 848, 854 (7th Cir. 1987), *cert. denied,* 484 U.S. 912.

Elements (1) and (2) are clearly lacking for this Court to apply res judicata to bar Stayart's present claims. There is no "final judgment" on Stayart's prior state law claims because supplemental jurisdiction was declined to resolve those claims.[13] There is also no identity of the causes of action which are, in fact, dissimilar, both in subject matter and time frame.

## 9. Yahoo Is Not Entitled to a Stay

The Court's prior ruling in Stayart's litigation against Yahoo is presently before the Seventh Circuit, No. 09-3379 (Motion to Dismiss, at 21). On this basis, Yahoo requests an indefinite stay until such time as the Seventh Circuit issues its decision (Motion to Dismiss, at 21-23).

A district court has the inherent power to stay cases before it, but that discretion is not boundless. Where the stay requested, as here, is *indefinite*, the Court must "first identify a pressing need for the stay." *Cherokee Nation of Oklahoma v. United States*, 124 F. 3d 1413, 1416 (Fed. Cir. 1997).

Yahoo has failed to identify any "pressing need" for a stay. The general rule has been stated that in order to warrant a stay of one action because of the pendency of another, the parties, the subject matter, and the relief sought must be the same in both actions. *Milwaukee v. Chicago, M. St. P. & P. R. Co.*, 223 Wis. 73, 269 N. W. 688 (1936). The other action must have a material or controlling effect in actual legal operation upon the suit to be stayed. *Dunfee v. Childs*, 59 W. Va. 225, 53 S. E. 209 (1906).

---

[13] Stayart is also challenging before the Seventh Circuit the failure of the district court to allow her to amend her complaint to allege diversity jurisdiction. Such an amendment would allow her to keep these state law claims before this Court.

The decision of the Seventh Circuit, involving the Lanham Act, no matter in whose favor, will *not* dispense with the need for a trial of the present claims of Stayart. Granting Yahoo a stay would therefore be an abuse of discretion. *Cf. Clinton v. Jones*, 520 U.S. 681, 707 (1997):

> [W]e are persuaded that it was an abuse of discretion for the District Court to defer the trial until after the President leaves office. Such a lengthy and categorical stay takes no account whatever of the respondent's interest in bringing the case to trial.

## 10. The Communications Decency Act Does Not Bar Stayart's Intellectual Property Claims

Yahoo finally argues that Stayart's state law intellectual property claims are barred by the Communications Decency Act of 1996, 47 U.S.C. § 230 ("CDA") (Motion to Dismiss, at 8-13).

### a. Yahoo Cannot Qualify for CDA Immunity

Section 230(c)(1) of the CDA protects from liability (1) a provider or user of an interactive computer service; (2) whom a plaintiff seeks to treat under a state law cause of action, as a publisher or speaker; (3) of information provided by another information content provider. *Ibid. See, Barnes v. Yahoo! Inc.*, 565 F. 3d 560 (9th Cir. 2009).

If a party cannot establish each of these requirements, he loses his protection under the CDA. *FTC v. Accusearch, Inc.*, 570 F. 2d 1187, 1196 (10th Cir. 2009).

As a search engine, Yahoo is an "interactive computer service" under the CDA. *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257, 1263 n. 6 (N.D. Cal. 2006). But Yahoo can simultaneously be an "interactive computer service" and an "information content provider" under § 230(f)(3) of the CDA. These categories are not mutually exclusive.[14]

An "information content provider" enjoys no CDA protection. In *Anthony, infra*, Yahoo was not immune from claims of fraud or negligent misrepresentation because it did not merely

---

[14] For example, a blogger can simultaneously be a provider and user of computer interactive services subject to immunity, as well as the speaker or content provider potentially liable for the speech on his or her blog. Jennifer L. Peterson, *The Shifting Legal Landscape of Blogging*, WISCONSIN LAWYER, March, 2006 8, 44.

publish third-party content.  Yahoo was accused of creating false user profiles on its online dating service.

The key issue is whether Yahoo acted as an "information content provider" with respect to the information which Stayart claims is false and misleading.  Here, Stayart seeks to hold Yahoo liable for misconduct with regard to its *own* statements, namely, the suggested search "bev stayart levitra" in its search assist box, and the suggestion "**Also try:  <u>bev stayart</u>** levitra" in its headers and footers.  Stayart alleges that Yahoo *created* this content through the actions of its robot which it solely programmed (Complaint, ¶¶ 43-44).  The CDA does *not* immunize Yahoo for its *own* alleged misconduct.  Yahoo has crossed the line from being only an Internet hosting site to an information content provider.

*Cf. Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 886 (E.D. Wis. 2009):

> Things are less clear with respect to Various.  In some contexts, the AdultFriendFinder website acts as an interactive computer service, but Stayart's complaint relates to the content of the AdultFriendFinder banner ad that was association with the *http://jewellery-makin-doorway.orge.pl./bev-stayart.html* URL. . . . Various' role in the creation of this banner ad is unclear.  At the pleading stage, the Court is unable to conclude that Various is entitled to immunity.

Yahoo asserts that this challenged content was created or developed by its algorithm (Motion to Dismiss, at 11).  Yahoo urges (Motion to Dismiss, at 11 n. 4):

> Significantly, Plaintiff does not allege that the process for generating the search suggestions referenced in the current complaint involves any knowing choice of Yahoo! or its employees to draft or input the suggestions at issue.

The fact that a search engine, such as Yahoo, uses automated means to create or develop content does not absolve it from liability for name appropriation under Wisconsin law.  Yahoo's proprietary algorithm is created, owned and programmed by Yahoo.

24

Yahoo's algorithm is its electronic *agent*. It is immaterial that an electronic agent has no legal capacity for it is still a tool of its principal, Yahoo. A slave, an infant, or an insane person, all without legal capacity, can still *bind* their principal. W. A. Seavey, HANDBOOK OF THE LAW AGENCY § 14 (West Publishing Co. 1964). When an agent acts consistent with his authority, "he has power to affect the legal relations of the principal to the same effect as if the principal had so acted." RESTATEMENT (SECOND) OF AGENCY § 26 (1958).

As noted by one commentator in the context of copyright infringement (Nicole Basher, *Comment, The Cache Cow: Can Caching and Copyright Co-Exist?*, 6 JOHN MARSHALL REV. INTELL. PROP. L. 101, 119 (2006):

> [A]ssume that a search engine programmed a robot to search the Internet and make copies of copyrighted songs or programmed its robots to download music illegally. Surely liability has not vanished simply because the search engine programmed a robot to do the dirty work for it, even though the robot's illegal music download was automatic.

Yahoo is responsible for its electronic agent because it directs its agent to perform its dirty work – in this case misappropriation of Stayart's name for profit. If Yahoo did not so direct its agent, it would have immediately removed all of the challenged content when demanded by Stayart's counsel in his December 18, 2009 letter. Neither Yahoo, nor the two attorneys representing Yahoo to whom this letter was directed, responded in any way to Plaintiff's counsel's letter before suit was filed. Yahoo also failed to remove its suggested search "bev stayart levitra" in its search assist box and the suggestion "**Also try:  bev stayart** levitra" in its headers and footers on the page "bev stayart" on Yahoo's web site. In Plaintiff's counsel's December 18, 2009 letter, he advised, "If Yahoo fails to immediately cooperate, we will be forced to file another lawsuit . . ." . Yahoo's failure to cooperate has resulted in the present litigation.

Yahoo has known since at least 2008 from the prior litigation between the parties that Stayart has *no connection* to male sexual dysfunction drugs. Yet it persists in 2010 with arrogantly

using Stayart's name to promote these products *for profit* through its "Sponsored Results" ads, thereby ratifying the conduct of its electronic agent in creating the keyword phrase "bev stayart levitra." "Ratification" is the confirmation and acceptance of a previous act, thereby making the act valid from the moment it was done. BLACK'S LAW DICTIONARY 1376 (9th ed. 2009). *Cf. Select Creations, Inc. v. Paliafito America, Inc.*, 830 F. Supp. 1223, 1236 (E.D. Wis. 1993).

### b.  Yahoo's Immunity Defense Is Foreclosed by the Plain Language of § 230(e)(2) of the CDA

The immunity contained within the CDA does *not* provide protection for enforcement of federal criminal statutes or intellectual property claims. 47 U.S.C. § 230(e). The statute states:

> (2)  NO EFFECT ON INTELLECTUAL PROPERTY LAW –
> Nothing in this section shall be construed to limit or expand
> any law pertaining to intellectual property.

The right of publicity (Stayart's state law claims) is widely recognized as an intellectual property right. *Almeida v. Amazon.com, Inc.*, 456 F. 3d 1316, 1322 (11th Cir. 2006); *ETW Corp. v. Jireh Publishing, Inc.*, 332 F. 3d 915, 928 (6th Cir. 2003) ("the right of publicity is an intellectual property right . . . which has been defined as the inherent right of every human being to control the commercial use of his or her identiy"); *Allison v. Vintage Sports Plaques*, 136 F. 3d 1443 (11th Cir. 1998) (common law right of publicity is an intellectual property right for purposes of the first-sale doctrine).

Secondary sources also support Stayart's position. *See*, J. Thomas McCarthy, *Melville B. Nimmer & the Rights of Publicity:  A Tribute*, 34 U.C.L.A. L. REV. 1703, 1712 (1987) (the right of publicity has "matured into a distinctive legal right category occupying an important place in the law of intellectual property"); BLACK'S LAW DICTIONARY 813 (7th ed. 1999) (defining intellectual property as "a category of intangible rights protecting commercially viable products of the human intellect.  The category comprises primarily trademark, copyright, and patent rights, but

also includes trade-secret rights, publicity rights, moral rights, and rights against unfair competition.").[15]

For this second *separate* reason, Yahoo enjoys no statutory immunity under the CDA from Stayart's claims in this litigation. Any other interpretation would "limit" the law pertaining to intellectual property, in contravention of the statutory language.

For example, in *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288 (D. N. H. 2008), *rehearing denied*, 2008 US Dist. LEXIS 38177, a state right of publicity claim was held not subject to dismissal under Section 230 of the CDA. The defendant was an online dating service. An unknown person published a nude photo and biography of the plaintiff on the dating service's web site. Portions of the fake profile were then displayed on third-party "teasers" to advertise the adult dating service. 540 F. Supp. 2d at 291-92.

The *Doe* court dismissed defamation, intentional infliction of emotional distress and other tort claims pursuant to Section 230. 540 F. Supp. 2d at 293-298. But the *Doe* court held that the re-publication of the plaintiff's fake profile violated her "intellectual property rights" under New Hampshire law. She claimed to be concerned about her "right of publicity" and Judge Joseph N. LaPlante in Concord, N.H., held that this claim fell within the language of § 230(e)(2) of the CDA. 540 F. Supp. 2d at 298-304.

The *Doe* court noted that New Hampshire recognizes a cause of action for infringement of the right of publicity as set forth in the RESTATEMENT (SECOND) OF TORTS § 652(C) (1977). 540 F. Supp. 2d at 303. This is *identical* to Wisconsin law.

---

[15] *Cf. Lugosi v. Universal Pictures*, 139 Cal. Rpt. 35, 37, 603 P. 2d 425 (App. 1979): "The tie-up of one's name, face and/or likeness with a business, product or service creates a tangible and saleable product in much the same way as property can be created by one who organizes under his own name a business to build and/or sell houses according to a fixed plan or who writes a book, paints a picture or creates an invention" (footnote omitted).

The dating web site urged that a Ninth Circuit Court of Appeals decision in *Perfect 10 v. CCBill, LLC*, 488 F. 3d 1102 (9th Cir.), *cert. denied*, 128 S. Ct. 709 (2007) limited § 230(e)(2) merely to "federal" intellectual property claims, and *not* state claims.

This is the same misguided argument made by Yahoo herein (Motion to Dismiss, at 12).

Judge LaPlante concluded that the "plain language" of § 230(e)(2) suggested that neither federal *nor state* IP claims fall under the scope of the CDA. According to Judge LaPlante, "The Ninth Circuit made no attempt to reckon with the presence of the term 'any' – or for that matter, the absence of the term 'federal' – in § 230(e)(2) when limiting it to federal intellectual property laws." Thus, § 230(e)(2) "applies simply to 'any law pertaining to intellectual property,' not just federal law." 540 F. Supp. 2d at 299-300.

Other courts have likewise followed this approach. *See, Atlantic Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 704 (S.D.N.Y. 2009):

> [A]s a matter of law . . . Section 230(c)(1) does not provide immunity for either federal or state intellectual property claims. *See . . . Gucci Am., Inc. v. Hall & Assocs.,* 135 F. Supp. 2d 409, 415 (S.D.N.Y.) 2001) ("the instant claims are grounded in the law of intellectual property and, therefore, do not, on a motion to dismiss, implicate Section 230 immunity."); *Lycos, Inc.*, 478 F. 3d at 422-23 (stating in dicta, that "[c]laims based on intellectual property laws are not subject to Section 230 immunity.").

*See also, Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 887-888 (E. D. Wis. 2009) (dicta):

> A "right to publicity" claim like the one recognized in *Hirsch* is generally considered an intellectual property claim, . . . which implicates the exception in § 230(e)(2).

By any reasonable interpretation of § 230(e)(2) of the CDA, Stayart's state claims in this case are "intellectual property claims" and not subject to any statutory immunity. A contrary interpretation would "limit" laws pertaining to intellectual property.

Yahoo's reliance on *Jurin v. Google, Inc.* (Motion to Dismiss, at 11-12), 2010 WL 727226 (C. D. Cal., March 1, 2010), is misguided. The court there held that the CDA immunized Google's

AdWords Program from four non-intellectual property claims under California law.  There was **no** "right of publicity" claim before that court.

### c.     Stayart Does Not Seek to Hold Yahoo Liable as a "Speaker" or "Publisher" Under State Law

For a third *separate* reason, Yahoo is not entitled to CDA protection.  This is because Stayart is not attempting to hold Yahoo liable as a "speaker" or "publisher" under Wisconsin law. This second element is needed for an Internet actor to claim protection under the CDA.

This is **not** a "defamation" case, which Yahoo falsely and irrationally asserts (Motion to Dismiss, at 2, 13).  Defamatory matter is anything which exposes the other to hatred, contempt, ridicule, degradation or disgrace in society or injury in the other's business or occupation. Wisconsin Statutes § 942.01(1).  Stayart's complaint does not sound in defamation.

A searcher looks for information about Stayart and her activities on the Internet.  When he types "bev stayart" on Yahoo, the suggested search "bev stayart levitra" immediately appears in the search assist box  before he can even press "enter".  After he presses "enter", the suggested search "**Also try:  bev stayart** levitra" appears in both a header and a footer on the page "bev stayart" on Yahoo's web site.  When clicking on this "header" and/or "footer", which Stayart alleges were created by Yahoo, Yahoo then directs (and is *paid* to direct) the searcher to Yahoo's "Sponsored Results" ads which have nothing to do with Stayart.  This also violates Yahoo's search content relevancy guideline.  If relevancy was important to Yahoo, there would be no "bev stayart levitra" page on Yahoo, or any "Sponsored Results" ads for male sexual dysfunction drugs on this page. Yahoo is **not** accused by Stayart of "publishing" anything defamatory, but instead of committing acts in the course of commerce – using Stayart's name, without her consent, to sell "Sponsored Results" ads.

Yahoo's duty to refrain from using Stayart's name for advertising or trade purposes does *not* depend on its status as an Internet search engine that only publishes content. Rather, this duty derives from Stayart's expectation that any business would not engage in unfair business practices by misappropriating her unique name. If Yahoo ran a traditional business out of a physical location and sold similar ads, such as on billboards or in magazines featuring "bev stayart levitra", Stayart would have the same causes of action under Wisconsin law. And nothing would protect Yahoo from liability, just as in this case.

In essence, the CDA does not extend to immunize a party's conduct outside the realm of the Internet just because it relates to the displaying of information on the Internet. *E.g., 800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 295 (D. N. J. 2006):

> [I]mmunity under the Act applies to any causes of action that would make service providers liable for information originating with a third-party user of the service. Immunity does not seem to fit here because the alleged fraud is the use of the trademark name in the bidding process, and not solely the information from third parties that appears on the search results page**. It is not the purpose of the Act to shield entities from claims of fraud and abuse arising from their own pay-for-priority advertising business, rather than from the actions of third parties** (emphasis added).

*And see, Goddard v. Google*, 562 F. 3d 1193, 1198 (N.D. Cal. 2009) (dicta):

> A plaintiff may not establish developer liability under the Communications Decency Act (CDA) merely by alleging that the operator of a website should have known that the availability of certain tools might facilitate the posting of improper content; substantially greater involvement is required, such as the situation in which **the website elicits the allegedly illegal content and makes aggressive use of it in conducting its business** (emphasis added).

## CONCLUSION

For all of the foregoing reasons, this Court should deny the motion to dismiss filed by Yahoo. In the instance that its motion is, in any part, granted, Plaintiff requests the Court leave to amend the Complaint.

Respectfully submitted,

BEVERLY STAYART

By /s/Gregory A. Stayart

Gregory A. Stayart, Esq.
N5577 Cobblestone Road
Elkhorn, WI  53121-3820
(262)745-7395

# EXHIBIT A



# Trademarks

## Raising Trademark Concerns about Sponsored Search™ Listings

Advertisers sometimes bid on search terms that are the trademarks of others. For bids on search terms in Yahoo! Search Marketing's Sponsored Search service, Yahoo! Search Marketing (formerly Overture Services, Inc.) requires advertisers to agree that their search terms, their listing titles and descriptions, and the content of their Web sites do not violate the trademark rights of others. In cases in which an advertiser has bid on a term that may be the trademark of another, Yahoo! Search Marketing allows the bids only if the advertiser presents content on its Web site that (a) refers to the trademark or its owner or related product in a permissible nominative manner without creating a likelihood of consumer confusion (for example, sale of a product bearing the trademark, or commentary, criticism or other permissible information about the trademark owner or its product) or (b) uses the term in a generic or merely descriptive manner. In addition, the advertiser's listing should disclose the nature of the relevant content.

As applied to nominative uses of another's trademark, Yahoo! Search Marketing requires advertisers to meet one of the following two conditions:

1. **Reseller**: The advertiser's site must sell (or clearly facilitate the sale of) the product or service bearing the trademark. The advertiser's title and description must disclose that the consumer will be able to purchase the product or service. The advertiser's title and description should not be written in a way that creates the impression that the advertiser is an authorized reseller unless the trademark owner has in fact designated the advertiser as an authorized reseller.
2. **Information Site, Not Competitive**: The primary purpose of the advertiser's site is to provide substantial information (for example, detailed product reviews or comparisons provided by unbiased sources, commentary, or news information) about the trademark owner or products or services bearing the trademark, AND the advertiser's site does not sell or promote, and is not an affiliate or partner of an entity that sells or promotes, a product or service that directly or indirectly competes with the trademark owner's products or services. The advertiser's title and description must disclose the nature of the qualifying substantial information that the consumer will find on the advertiser's site.

If you have a concern that a search term associated with an advertiser's listing is an improper use of a term that is a trademark, Yahoo! Search Marketing will review the advertiser's listing for compliance with our relevancy guidelines and, if appropriate, Yahoo! Search Marketing will remove the advertiser's listing or the content of the listing's title or description will be modified. In order to assist Yahoo! Search Marketing in expeditiously addressing your concern, please provide the following information:

1. The search term which, when entered, caused the advertiser's listing to appear.
2. The trademark on which your claim is based.
3. If you own a current registration for the trademark on the Principal Register in the United States Patent and Trademark Office, the registration number.
4. If you have evidence of any consumer confusion resulting from the advertiser's bid on the search term, a description of such evidence.
5. If you have contacted the advertiser about your concerns, the status of your communications with the advertiser.

Please forward this information to Yahoo! Search Marketing at the following email address: trademarkconcern-ysm@yahoo-inc.com. You may also mail your concerns to:

Yahoo! Search Marketing
Attn: Trademark Department
3333 Empire Avenue
Burbank, California 91504
Fax: 818 524-3001

If your concern is about links or advertising content appearing on a domain in our Domain Match program, please click here for more information about Yahoo! Search Marketing's notification procedure.

Case 2:10-cv-00043-LA   Filed 05/03/10   Page 33 of 35   Document 15

If your concern is about a Local Sponsored Search listing, please click here for more information about Yahoo! Search Marketing's notification and counter-notification procedure for Local Sponsored Search listings.

Copyright © 2009 Yahoo! Inc. All rights reserved.

Copyright/IP Policy | Terms of Service | Trademarks | Patents | Help | Marketing Alliances | Advertise Internationally

NOTICE: We collect personal information on this site. To learn more about how we use your information, see our **Privacy Policy**.

CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2010, I electronically filed with the clerk of the Court the accompanying Plaintiff Beverly Stayart's Response to Defendant Yahoo! Inc.'s Motion to Dismiss Counts I and II of Plaintiff's Complaint using the ECF System which will automatically send notification of such filing to Yahoo's counsel:

> Christian S. Genetski
> christian@zwillgen.com


                                        /s/Gregory A. Stayart